IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TIMOTHY McDEVITT, | ) | Civ. No. 06-00216 ACK/BMK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LIANNE M. GUENTHER, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DENYING DEFENDANT'S COUNTER-MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION IN LIMINE, AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S EXPERT'S TESTIMONY**

**PROCEDURAL BACKGROUND**

On April 20, 2006, Timothy McDevitt ("Plaintiff") filed a Complaint against Lianne M. Guenther, an attorney licensed to practice law in Minnesota, ("Defendant") relating to a prenuptial agreement that Defendant allegedly prepared for Plaintiff. The Complaint alleges that Defendant committed legal malpractice, negligence, breach of fiduciary duties, non-disclosure, and fraud, and violated Haw. Rev. Stat. § 480-2. See Complaint at 8. Although the Complaint initially sought $524,069.71 in actual damages, Plaintiff now seeks only $235,000 for the difference between the settlement he paid to his wife and the amount he

1

would have allegedly paid under his desired prenuptial agreement.
See Complaint at 8.  Plaintiff has elected to withdraw claims for
damages arising from temporary support payments, legal fees and
mediation expenses incurred in the divorce proceeding, damage to
his home, or increased rental expenses. See Pl. Opp. at 13.  In
addition to his claim for actual damages, Plaintiff seeks
"[g]eneral, special, treble and punitive damages in amounts to be
proven at the time of trial" and attorneys' fees, costs, and
interest.  See Complaint at 9.

Previously on May 17, 2006, Defendant filed a Motion to
Dismiss Complaint, or in the Alternative, to Transfer and a
Memorandum in Support of Motion ("Motion to Dismiss"), seeking
dismissal for lack of personal jurisdiction, improper venue,
insufficient service of process, and/or failure to state a claim
upon which relief can be granted, or in the alternative, transfer
to the District of Minnesota.  On July 25, 2006, the Court issued
an Order denying Defendant's Motion to Dismiss, or in the
alternative, Transfer.

On April 13, 2007, Defendant filed a Motion for Summary
Judgment or in the Alternative, Partial Summary Judgment alleging
that Plaintiff's claim for damages must fail because it is
speculative and premised upon an inadmissible settlement
agreement and that the statute of repose bars Plaintiff's
unlawful business practices claim ("Def. Motion"). The same day,

2

Defendant also filed a statement of facts in support of her Motion ("Def. CSF"). Simultaneously, Defendant filed a Motion in Limine to exclude evidence of Plaintiff's settlement with his wife to calculate the amount of damage ("Def. Limine Mot.").

On April 24, 2007, Plaintiff filed a Motion for Partial Summary Judgment alleging the existence of an attorney-client relationship between Plaintiff McDevitt and Defendant Guenther ("Pl. Motion"). Plaintiff also filed a concise statement of facts ("Pl. CSF").

On June 8, 2007, Plaintiff filed an Opposition to Defendant's Motion ("Pl. Opp."). Plaintiff also filed an Opposition to Defendant's Motion in Limine ("Pl. Limine Opp."). The same day, Defendant filed an Opposition to Plaintiff's Motion ("Def. Opp."). Defendant also filed a Counter-Motion for Summary Judgment on the issue of the existence of an attorney-client relationship.

Plaintiff filed a Motion to Strike Defendant's Counter-Motion on June 12, 2007 along with a Motion to Shorten Time to hear the Motion to Strike. On June 14, 2007, Magistrate Judge Kurren issued an Order Granting Plaintiff's Motion to Strike because Defendant's Counter-Motion was filed after the dispositive motion deadline specified in the Rule 16 scheduling order. Subsequently, Defendant filed a Motion to Amend the Rule 16 Scheduling Motion, or Alternatively for Leave to File Her

Counter-Motion for Summary Judgment on the issue of the existence of an attorney-client relationship with McDevitt. Plaintiff filed an Opposition.  The matter was heard before Magistrate Judge Kurren on June 21, 2007, at which hearing Magistrate Judge Kurren ruled from the bench granting Defendant's Motion to file her Counter-Motion for Summary Judgment.

On June 15, 2007, Defendant filed a Reply in support of her Motion for Summary Judgment and her Motion in Limine. The same day, Plaintiff filed a Reply in support of his Partial Motion for Summary Judgment and a Concise Statement in Opposition to Defendant's Motion.

On June 19, 2007, Defendant filed an Objection to and Motion Strike the Testimony of Charles T. Kleintop, Plaintiff's expert.  On June 21, 2007, Plaintiff filed a Response to Defendant's Objection.

A hearing on (1) Defendant's Motion for Summary Judgement or in the alternative, Partial Summary Judgment; (2) Defendant's Motion in Limine; (3) Plaintiff's Motion for Partial Summary Judgment; (4) Defendant's Counter-Motion for Summary Judgment; and (5) Defendant's Motion to Strike Plaintiff's Expert's Testimony was heard on Wednesday, June 27, 2007 at 10:30 a.m..

## FACTUAL BACKGROUND[1]

Plaintiff McDevitt is, and was at all pertinent times, a resident of the State of Hawai`I, where he practices cosmetic and reconstructive surgery of the eyelids, Lacrimal System and Orbital Laser Skin Resurfacing in Honolulu, Hawai`I.  See Complaint at 1-2.  Defendant Guenther is, and was at all pertinent times, a resident of the State of Minnesota, where she is a sole legal practitioner.  Id. at 2.

Guenther previously attended college with Andrea Yoakam ("Yoakam") in Minnesota, where they became "best friends" and have stayed close.  See Guenther Depo. at 13; Yoakam Depo. at 17-18.  Plaintiff met Defendant through Yoakam in 1999 and knew that she was Yoakam's best friend.  See McDevitt Depo. at 51.  In 2000, Yoakam was living in Hawai`I, where she worked as a nurse and was engaged to be married to Plaintiff.  See Complaint at 2; McDevitt Depo. at 48; McDevitt Aff. at ¶ 3.

Prior to becoming engaged, McDevitt raised the issue of a prenuptial agreement with Yoakam and Yoakam said she was opposed.  See McDevitt Depo. at 52-53. They discussed it again after getting engaged and Yoakam reacted negatively and became very upset.  See Yoakam Depo. at 26.

---

[1] The facts as recited in this Order are for the purpose of disposing of this motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

According to McDevitt, in June or July of 2000, McDevitt, Yoakam, and Guenther engaged in three-way conversations about the advisability of a prenuptial agreement.  See McDevitt Depo. at 76-78. Guenther testified that during these discussions she told McDevitt, "I don't know what Hawaii law requires."  See Guenther Depo. at 40. According to Guenther, in August of 2000, Yoakam asked Guenther to look at a prenuptial agreement, to which Guenther stated she replied "I don't know what the law in Hawaii is," and advised Yoakam to get her own lawyer in Hawai`I.  See Guenther Depo. at 34-36.  Guenther and Yoakam both testified that Guenther orally told McDevitt and Yoakam that they needed their own lawyers in Hawai`I for the purposes of preparing a premarital agreement.  See Guenther Depo. at 70; Yoakam Depo. at 69. McDevitt asserts that he does not recall Guenther telling him that she was not authorized to practice law in Hawai`I and that he and Yoakam should get their own attorneys.  See McDevitt Depo. at 81. During their conversations, McDevitt did not explicitly ask Guenther to represent him in the prenuptial agreement negotiations.  Id.  Guenther acknowledges that she talked with both McDevitt and Yoakam about the prenuptial agreement and suggested that McDevitt fund an IRA on Yoakam's behalf if she was not working outside the home.  See Guenther Depo at 49.

On August 20, 2000, McDevitt faxed a three-page note to Guenther which stated, "Lianne, Please review, add what you want.

Use template and fax back to me . . . Please charge me your usual

fee." The second page contained the following:

> Agreements between Andrea Yoakam (AY) and Tim McDevitt (TM):
>
> 1.   TM will open IRA account for AY and fund account at legal maximum per year for every year of marriage.
>
> 2. In event of divorce, TM will pay AY $250,000.00.  She will be entitled to no additional payment or property.
>
> 3. TM will not be responsible for the personal debts accumulated by AY before or after marriage.

The third page of the fax sent by McDevitt on August 20, 2000

contained notes disclosing assets of McDevitt. See McDevitt Depo.

at 74.  Yoakam denies ever agreeing to the term limiting

McDevitt's payment in the event of a divorce to $250,000. See

Yoakam Depo. at 58.  Yoakam did not sign the faxed document

containing the $250,000 limitation term.  See McDevitt Depo. at

170-171.

McDevitt stated that when he sent this fax, he believed

he was engaging Guenther to act as his attorney and to advise and

assist him in the preparation of a prenuptial agreement.  See

McDevitt Aff. at ¶ 6.  Guenther testified that she did not

understand the fax as requesting her to perform legal services,

but that she was to review the information as a friend and type

it up on her computer.  See Guenther Depo. at 65.

During the time of these discussions, Guenther says she

had discussions with Yoakam alone, but no discussions with

McDevitt alone. See Guenther Depo. at 41-42.  Guenther and Yoakam

discussed Yoakam's concern that the $250,000 lump sum payment

term was not fair to her if she was married for a long period of

time, and they discussed a graduated scale payment system. See

Guenther Depo. at 51-53; Yoakam Depo. at 59-60.  Yoakam testified

that when she discussed the prenuptial with Guenther, "I remember

just telling her that I couldn't – it was very upsetting to me,

terribly upsetting; and, quite frankly, I wanted her to handle it

for me."  See Yoakam Depo. at 29. Regarding the $250,000 lump-sum

payment, Yoakam testified, "I remember thinking Lianne will take

care of what – you know, the final amount and whatever Lianne

sees fit." See Yoakam Depo. at 58. Guenther also recalls

discussing a graduated scale payment with Yoakam and McDevitt

together. See Guenther Depo. at 53, 55-56.

On August 30, 2000 Guenther faxed a "rough draft"

prenuptial agreement addressed to Yoakam and McDevitt.  In a note

accompanying the draft, Guenther wrote:

> Andrea and Tim:
>
> Following is a rough draft of agreement.  I will be out of
> the office this afternoon and back on Monday.  I did not put
> language in about debts because I did not know what your
> agreement or intent was on that issue.  Tim won't be
> responsible for any debts Andrea incurs? What about taxes,
> mortgage, medical bills?  It seemed like the proposed
> language was broader than what I assumed your intent might
> be.  So you or I could add language to effectuate your goals
> regarding debts.  Also let me know if you want me to email
> to you.

See McDevitt Depo. Exh. 17.  Guenther testified that she obtained

the language for the preamble and paragraphs one and two of the

draft agreement from a template that was sent to her by McDevitt. See Guenther Depo. at 76-78. She acknowledges drafting the language in paragraphs three and four. Id. at 78-80. The rough draft contained a term providing for a sliding scale payment system, starting at $250,000, rising to $300,000 after three years of marriage, and increasing by $100,000 per year to a cap of $1 million. See McDevitt Depo. Exh. 17.

Yoakam does not recall seeing the "rough draft" agreement or discussing it with McDevitt prior to the day she signed it on September 9, 2000. See Yoakam Depo. at 66. Yoakam testified that on September 9, 2000, McDevitt told her, "Get in the car. We are going to go sign the prenup," because it was the last business day before she was to fly to Minnesota for the wedding. Id. at 67. She testified that she signed the agreement before a notary at the bank and that she was crying, shaking, and vomited. Id. at 85. She also recalls that McDevitt said he would not marry her unless she signed it, and he promised to tear it up. Id. Yoakam believes that she was not given full disclosure of McDevitt's assets and that she was not informed of her rights under the prenuptial agreement. Id. at 68, 127, 155.

McDevitt testified that he agreed to the terms in the "rough draft" agreement based on his belief that Guenther had advised him the provisions were necessary to make the agreement enforceable. See McDevitt Aff. at ¶¶ 7, 8. On or about

9

September 9, 2000, McDevitt sent Guenther a check for $500 with
the notation stating "review and draft Prenuptial." Id. at ¶ 13;
Pl. Opp. Exhs. "C", "D".  Guenther stated that she was not
planning on cashing it because she did not bill Yoakam or
McDevitt for her services.  See Guenther Depo. at 97.  Guenther
stated that she held on to the check for months and cashed it
when Yoakam asked her to. Id.

On July 23, 2003, McDevitt and Yoakam separated.  See
McDevitt Aff. at ¶ 13. On October 23, 2003 McDevitt filed for
divorce pro se. Id. at ¶ 14.  McDevitt's divorce filing did not
reference the prenuptial agreement, and his proposed divorce
decree only provided Yoakam with her car and her retirement
account. See McDevitt Depo. at 117; Exh. "25".

During the divorce proceedings, Yoakam challenged the
enforceability of the prenuptial agreement asserting that she had
not been fully informed of her rights, that the agreement had
been procured by duress, and that McDevitt had not truthfully
disclosed his assets at the time of signing.  See McDevitt Depo.
at 137. Guenther told Yoakam's divorce counsel that she believed
the prenuptial agreement was not enforceable. See Guenther Depo.
116-17; McDevitt Depo. Exh. "19" .  McDevitt, through his
attorney Geoff Hamilton, asserted that "[i]t is our understanding
that the parties signed a 'Premarriage Agreement' drafted by
Andrea Yoakam-McDevitt's attorney." See Hamilton Depo. Exh. "7".

10

In his motion for summary judgment to enforce the premarriage agreement before the family court, McDevitt argued "the Agreement was prepared by Wife's friend, Lianne Guenther, Esq.," and later stated, "it was Wife's friend and ex-college roommate who was tasked with drafting the agreement."  <u>See</u> McDevitt Depo. Exh. "37" at 6, 9.

On August 30, 2004, McDevitt and Yoakam entered a settlement agreement in contemplation of divorce in which McDevitt agreed to pay Yoakam $485,000. <u>See</u> McDevitt Depo at 146, Exh. "40".

### **STANDARD**

### **Motion for Summary Judgment**

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56©.

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such

that a reasonable jury could return a verdict for the nonmoving

party.'" <u>Thrifty Oil Co. v. Bank of America National Trust &</u>

<u>Savings Ass'n</u>, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986))

(internal citation omitted).[2]  Conversely, where the evidence

could not lead a rational trier of fact to find for the nonmoving

party, no genuine issue exists for trial.  <u>See Matsushita</u>

<u>Electrical Industrial Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S.

574, 587 (1986) (citing <u>First National Bank of Arizona v. Cities</u>

<u>Service Co.</u>, 391 U.S. 253, 289 (1968)).

The moving party has the burden of persuading the court

as to the absence of a genuine issue of material fact.  <u>Celotex</u>,

477 U.S. at 323; <u>Miller v. Glenn Miller Productions</u>, 454 F.3d

975, 987 (9th Cir. 2006).  The moving party may do so with

affirmative evidence or by "'showing'--that is pointing out to

the district court--that there is an absence of evidence to

support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.[3]

_____

[2]Disputes as to immaterial issues of fact do "not preclude
summary judgment." <u>Lynn v. Sheet Metal Workers' International
Ass'n</u>, 804 F.2d 1472, 1483 (9th Cir. 1986).

[3]When the moving party bears the burden of proof at trial,
that party must satisfy its burden with respect to the motion for
summary judgment by coming forward with affirmative evidence that
would entitle it to a directed verdict if the evidence were to go
uncontroverted at trial.  <u>Miller</u>, 454 F.3d at 987 (quoting <u>C.A.R.
Transportation Brokerage Co. v. Darden Restaurants, Inc.</u>, 213
F.3d 474, 480 (9th Cir. 2000)).  When the nonmoving party bears
the burden of proof at trial, the party moving for summary
judgment may satisfy its burden with respect to the motion for

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See Celotex, 477 U.S. 323; Matsushita Elec., 475 U.S. at 586; California Architecture Building Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[4]  The nonmoving party must instead set forth "significant probative evidence" in support of its position.  T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. See T.W. Electrical Service, 809 F.2d at 630-31.[5]  Accordingly,

_____

summary judgment by pointing out to the court an absence of evidence from the nonmoving party.  Miller, 454 F.3d at 987.

[4]Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also T.W. Electrical Service, 809 F.2d 626, 630 (9th Cir. 1987).

[5]At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.  Anderson

if "reasonable minds could differ as to the import of the

evidence," summary judgment will be denied.  <u>Anderson v. Liberty

Lobby, Inc.</u>, 477 U.S. 242, 250-51 (1986).

## **DISCUSSION**

Plaintiff's Motion asserts that there was an attorney-

client relationship between himself and Defendant Guenther

regarding the reviewing and drafting of his prenuptial agreement

with Andrea Yoakam.  Defendant's Counter-Motion alleges that she

is entitled to summary judgment on the lack of an attorney-client

relationship between herself and McDevitt regarding the

prenuptial agreement.

Defendant's Motion asserts that Federal Rule of

Evidence 408 prohibits Plaintiff from basing his damages claim

upon evidence from his settlement with Yoakam, that Plaintiff's

claim for damages is speculative, and that Plaintiff's claim

under Haw. Rev. Stat. § 480-2 is barred by the applicable statute

of limitations.[6]  Defendant separately filed a Motion in Limine

_____

<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Bator v. State
of Hawai`I</u>, 39 F.3d 1021, 1026 (9th Cir. 1994).

[6] The Defendant actually asserts that Plaintiff's claim is
barred by the statute of repose.  "'Statutes of limitations'
extinguish after period of time, right to prosecute accrued cause
of action; 'statute of repose,' by contrast, limits potential
liability by limiting time during which cause of action can
arise." Black's Law Dictionary 1411 (6th ed. 1990).  The
applicable statute for an unlawful business practices claim is a
statute of limitations.  Haw. Rev. Stat. § 480-24.  Thus, the
Court construes Defendant's argument as one premised on the
applicable statute of limitations.

arguing that Plaintiff's evidence from his settlement with Yoakam is inadmissible under Rule 408.

Defendant also filed a Motion to Strike the testimony of Charles Kleintop, Plaintiff's expert.

## I.   Existence of Attorney-Client Relationship

Plaintiff McDevitt argues that he is entitled to a Partial Motion for Summary Judgment on the existence of an attorney-client relationship between himself and Defendant Guenther for the negotiation and drafting of the prenuptial agreement between himself and Yoakam.  Guenther disagrees. The existence of an attorney-client relationship is a necessary element for Plaintiff's legal malpractice claim.[7] See Boskoff v. Yano, 57 F. Supp. 2d 994, 998 (D. Haw. 1998).  A claim for legal malpractice requires a plaintiff to prove four elements: (1) the existence of an attorney-client relationship; (2) the existence of a duty on the part of a lawyer; (3) breach of that duty; and (4) damages flowing from the breach.  Id. If no attorney-client relationship existed, no claim for legal malpractice can be asserted.

---

[7] The lack of an attorney-client relationship does not, however, defeat Plaintiff's claim for breach of fiduciary duty. An attorney may owe fiduciary obligations even in the absence of an express attorney-client relationship when an implied professional relationship has arisen.  See Trone v. Smith, 621 F.2d 994, 1002 (9th Cir. 1980); Westinghouse Electric Corp. v. Kerr-McGee Corp., 580 F.2d 1311, 1319 (7th Cir. 1978); Otaka, Inc. v. Klein, 71 Haw. 376, at 382, 791 P.2d 713, 717 (Haw. 1990).

The Court looks to the nature of interaction between the parties to determine whether an attorney-client relationship exists.  "Whether and to what extent an attorney-client relationship is present is a question of fact." Stender v. Vincent, 92 Haw. 355, 363, 992 P.2d 50, 58 (Haw. 2000).  "An attorney-client relationship is contractual and consensual, and such a relationship can be formed only with the consent of the attorney and individual seeking representation."  Boskoff, 57 F. Supp. 2d at 998.  "An attorney-client relationship is formed when an attorney renders advice directly to a client who has consulted him seeking legal counsel." Id. (citing Waggoner v. Snow, Becker, Kroll, Klaris & Krauss, 991 F.2d 1501, 1505 (9th Cir. 1993)).  In Boskoff, this Court recognized factors that are relevant in determining whether or not an attorney client relationship has formed:

> The court may look to the intent and conduct of the parties to determine whether the relationship was actually formed. One factor to be considered is whether the client believed an attorney-client relationship existed.  However, the belief must be objectively reasonable under the totality of the circumstances, which includes consideration of factors such as the intent of the alleged client and attorney and payment arrangements.

Boskoff, 57 F. Supp. 2d at 998 (citations and quotations omitted).

It appears that no formal agreement was ever drafted wherein Guenther agreed to represent McDevitt in the matter of his prenuptial agreement with Yoakam.  Nor did McDevitt

16

explicitly ask Guenther to represent him in the matter.  <u>See</u>

McDevitt depo. at 81.  Guenther never submitted a bill to

McDevitt for services rendered.  <u>See</u> McDevitt depo. at 103-104.

There was no express attorney-client contract formed between

Guenther and McDevitt.  Nevertheless, an implied attorney-client

relationship may have been established.

Certain factors weigh in McDevitt's favor.  McDevitt

stated that he subjectively believed that he was engaging

Guenther to be his attorney when he sent her the fax dated August

20, 2000, on which he wrote, "Lianne, Please review, add what you

want.  Use template and fax back to me . . . Please charge me

your usual fee."[8]  The fax requested Guenther to provide legal

---

[8]   Defendant argues that judicial estoppel bars Plaintiff
from asserting that he believed that Guenther was his attorney
during the negotiations of the prenuptial agreement.  "Judicial
estoppel, sometimes also known as the doctrine of preclusion of
inconsistent positions, precludes a party from gaining an
advantage by taking one position, and then seeking a second
advantage by taking an incompatible position." <u>Helfand v. Gerson</u>,
105 F.3d 530, 534 (9th Cir. 1997).  Guenther argues that during
the divorce proceedings, McDevitt took the inconsistent position
that Guenther was Yoakam's attorney.  Judicial estoppel does not
apply here because McDevitt derived no benefit through the family
court's action by arguing that the agreement was enforceable
because it was drafted by Yoakam's best friend.  McDevitt settled
the divorce action.  McDevitt's divorce counsel took that
position in correspondence with Yoakam's counsel in a settlement
offer.  Although the Plaintiff has not challenged the admission
of this letter, the Court questions the admissibility of this
offer under Federal Rule of Evidence 408. McDevitt's assertion to
the family court that the prenuptial agreement was drafted by
Yoakam's friend and ex-college roommate casts doubt upon his
asserted belief that Guenther was his attorney, but is not
necessarily inconsistent.  It is possible, albeit perhaps
unreasonable, that McDevitt believed Guenther to be his attorney

services by asking her to review and then draft a prenuptial

agreement based on a template.  Rather than decline to provide

these services or clarify that she was only serving as a

scrivener and as a friend, Guenther proceeded to create a "rough

draft" prenuptial agreement based on a template allegedly

provided by McDevitt, the faxed note, and conversations she had

with McDevitt and Yoakam.  In a series of three-way conversations

with McDevitt and Yoakam, Guenther allegedly advised them that in

light of the significant discrepancy in their assets, a

premarital agreement was probably appropriate.  She also

discussed the advisability of a prenuptial agreement, the funding

of an IRA for Yoakam, and using a "sliding scale" payment versus

a $250,000 "cap".  Although it is unclear whether Guenther

suggested the sliding scale payment term of the agreement, in the

course of their conversations, it appears Guenther did provide

legal advice by discussing the legal options and ramifications of

certain agreement terms.  McDevitt asserts that he agreed to the

provision creating a sliding scale payment with a cap at $1

million because he believed that Guenther advised him that a

sliding scale provision was necessary to make the agreement

_____

regarding the prenuptial agreement notwithstanding her friendship
ties with Yoakam.  Moreover, his belief at the time of the
drafting, when all parties were on good terms, could have
subjectively changed following his petition for divorce.
Judicial estoppel does not bar McDevitt from asserting his belief
in an attorney-client relationship with Guenther.

18

enforceable. A final factor that weighs in McDevitt's favor is the $500 check he wrote to Guenther with the notation "review and draft Prenuptial."  Although he never received a bill from Guenther, McDevitt came up with the $500 figure based upon their discussion of her hourly rate and an approximation of how much time she had spent reviewing and drafting the agreement.  These facts support finding that an attorney-client relationship may have been established between Guenther and McDevitt.

Other factors tend to favor Guenther's position that no attorney-client relationship existed between herself and McDevitt.  Guenther stated that her intent was that she was discussing, reviewing, and typing the prenuptial agreement as a friend and not as an attorney.  In addition, McDevitt's faxed note on August 20, 2000 telling Guenther to "add whatever you want" to the prenuptial agreement, coupled with his testimony that he believed Yoakam would accept whatever Guenther drafted, suggests he believed Guenther to be acting as Yoakam's attorney, not his.  In the rough draft of the prenuptial agreement, Guenther added provisions that clearly benefitted Yoakam, including a sliding scale provision that started payment at $250,000 and capping the payment at $1 million instead of the $250,000 cap McDevitt requested.  If Guenther believed and advised that a sliding scale provision was necessary to make the agreement enforceable, as McDevitt testified, it is unclear why

19

the scale could not have been created to start at a lower amount with a cap at $250,000.  If she had been representing McDevitt's interests, then she could have drafted a sliding scale provision that retained the $250,000 cap.  These facts are more consistent with a finding that Guenther was representing Yoakam rather than McDevitt.

Furthermore, while the putative client's subjective belief is an important factor for determining the existence of an attorney-client relationship, the client's belief must be objectively reasonable.  "Courts have refused to disqualify counsel, for example, where the prospective client should have known that the relationship had not advanced to the point where it could be deemed a representation."  In re Johore Investment Co., 157 B.R. 671, 676 (D. Haw. 1985).  Guenther argues that it was not reasonable for McDevitt to believe that she was his attorney for the purposes of drafting the prenuptial agreement because he knew that Guenther was Yoakam's best friend and confidante.  Guenther asserts that she never spoke to McDevitt alone during this time, but only in three-way conversations that also included Yoakam.  By contrast, she often spoke with Yoakam alone about the prenuptial agreement.  Guenther testified that she told McDevitt and Yoakam to seek attorneys in Hawai`I regarding the prenuptial agreement.  McDevitt denies this assertion.  The "rough draft" prenuptial agreement that Guenther

20

drafted was addressed to both Yoakam and McDevitt, not to McDevitt alone.  Guenther asserts that the request for her to review a prenuptial agreement first came from Yoakam.  Yoakam's testimony reflects her reliance on Guenther to look out for her interests in the prenuptial agreement as her closest friend.  The factfinder could conclude that McDevitt's asserted subjective belief in an attorney-client relationship with Guenther was unreasonable under the totality of the circumstances, including McDevitt's knowledge of Guenther's close alliance with Yoakam.

Finally, McDevitt's divorce attorney asserted in correspondence with Yoakam's attorney that it was their understanding that the prenuptial agreement was drafted by Yoakam's counsel.[9]  When McDevitt argued before the family court that the agreement was enforceable and signed by Yoakam voluntarily, he cited the fact that the agreement was prepared by her friend and ex-college roommate to demonstrate that Yoakam was amenable to the agreement and aware of her rights.  These circumstances all support a finding that McDevitt's asserted belief in his attorney-client relationship with Guenther was objectively unreasonable.  Viewing all facts in a light most favorable to the non-moving party, a factfinder could conclude that if any attorney-client relationship existed it was between

---

[9]  The Court notes again that although McDevitt has not raised any objection, evidence from the settlement offer may be inadmissible under Federal Rule of Evidence 408.

21

Guenther and Yoakam, not Guenther and McDevitt.

Accordingly, the Court holds that there is a genuine issue of material fact as to whether an attorney-client relationship existed between McDevitt and Guenther regarding the drafting of the prenuptial agreement.  Plaintiff's Partial Motion for Summary Judgment on the issue of the existence of an attorney-client relationship is DENIED.  Defendant's Counter motion for Summary Judgment on the nonexistence of an attorney-client relationship is likewise DENIED.

## II.   Whether Damages May Be Premised on Settlement Agreement Under Federal Rule of Evidence 408

In her Motion for Summary Judgment and Motion in Limine, Defendant argues that Plaintiff is precluded from calculating his damages based on his settlement amount with his wife because evidence of the settlement is inadmissible under Rule 408 of the Federal Rules of Evidence.

Federal Rule of Evidence 408 provides that evidence of a settlement offer, negotiation, or agreement is "not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount." Courts are split as to whether Rule 408 bars admission of evidence from a settlement between plaintiff and a third party to calculate a claim for damages against a defendant who is not a party to the original suit in which the settlement occurred.

22

Some courts have held that Rule 408 bars admission of evidence from a party's settlement with a third party.  See e.g., Banker v. Nighswander, Martin & Mitchell, 37 F.3d 866, 872 (2d Cir. 1994)(noting that the plaintiff could not rely upon his settlement amount with third parties when calculating malpractice damages against his former attorney because they are inadmissible under Rule 408); Pierce v. F.R. Tripler & Co., 955 F.2d 820, 828 (2d Cir. 1992)(quoting Kennon v. Slipstreamer, Inc., 794 F.2d 1067, 1069 (5th Cir. 1986)("Even where the evidence offered favors the settling party and is objected to by a party not involved in the settlement, Rule 408 bars the admission of such evidence unless it is admissible for a purpose other than 'to prove liability for or invalidity of the claim or its amount.'")).

Other courts have suggested that Rule 408 does not bar the introduction of settlement agreements regarding claims other than the one being litigated.  See, e.g., Towerridge, Inc. v. T.A.O., Inc., 111 F.3d 758, 770 (10th Cir. 1997) ("Rule 408 does not require the exclusion of evidence regarding the settlement of a claim different from the one litigated"); Armstrong v. HRB Royalty, Inc., 392 F. Supp. 2d 1302, 1304-05 (S.D. Ala. 2005)("Rule 408 excludes evidence of settlement offers only if such evidence is offered to prove liability for or invalidity [or amount] of the claim under negotiation. . . . Rule 408

23

unambiguously requires that the claim as to which a settlement offer was made and the claim at issue in the litigation in which the offer is proffered as evidence must be the same claim."(citing Vulcan Hart Corp. v. National Labor Relations Board, 718 F.2d 269, 277 (8th Cir. 1983)).

The Ninth Circuit has held that "The [plaintiff-appellants'] contention that Rule 408 does not apply when third party compromises are involved is not tenable. Rule 408 does apply to situations where the party seeking to introduce evidence of a compromise was not involved in the original compromise." Hudspeth v. C.I.R., 914 F.2d 1207, 1213 (9th Cir. 1990); see also United States v. Contra Costa Water District, 678 F.2d 90, 92 (9th Cir. 1982)(barring admission of amount of settlement and stating "we give additional importance to the fact that appellant [seeking to introduce the evidence] was not a party to the Hanford litigation or the settlement conferences").

In Hudspeth and Contra Costa the parties seeking to introduce the evidence were not parties to the settlement, whereas here, the Plaintiff is trying to introduce evidence of his own third-party settlement with his wife.  The Hudspeth court reasoned that settlements by the defendant Tax Commissioner would be inhibited if the Commissioner had to consider whether a settlement would be binding in subsequent cases. Id. at 1214. Plaintiff argues that using the evidence of his settlement offer

24

to his own advantage in this case would not deter him from making settlement offers, so allowing him to introduce the evidence would not frustrate the policy goals of Rule 408.  The Court is mindful that Rule 408 also protects the interests of the other party to the compromise in order to encourage both parties to reach a settlement agreement.  Although the facts of this case may be unusual, Yoakam may have felt constrained in her divorce settlement negotiation with McDevitt if she had known that he would attempt to use evidence of her settlement in a suit against her best friend or if she had known that the fact of her settlement or its amount would be disclosed before a jury in this case. The Advisory Committee to the 2006 amendment to Rule 408 notes,

> The amendment makes clear that Rule 408 excludes compromise evidence even when a party seeks to admit its own settlement offer or statements made in settlement negotiations.  If a party were to reveal its own statement or offer, this could itself reveal the fact that the adversary entered into settlement negotiations.  The protections of Rule 408 cannot be waived unilaterally because the Rule, by definition, protects both parties from having the fact of negotiation disclosed to the jury.  Moreover, proof of statements and offers made in settlement would often have to be made through the testimony of attorneys, leading to the risks and costs of disqualification.

The Court is dubious about the wisdom of applying Rule 408 differently depending on whether the settlement evidence is offered to the advantage of the settling party or not.  At least one commentator has agreed, stating, "Rule 408 prohibits the use of settlement negotiations and agreements as evidence of

liability or damages regardless of whether a party or nonparty to the negotiations and settlement seeks its introduction.  This prohibition applies even where the settlement evidence favors the settling party." Charles E. Wagner, <u>Federal Rules of Evidence Case Law and Commentary</u> 433 (1999-2000 ed.)(citing <u>Kennon</u>, 794 F.2d 1067; <u>Parker v. O'Rion Industries, Inc.</u>, 769 F.2d 647 (10th Cir. 1985)). At the time of settlement, parties do not know whether the evidence of the settlement offer will become useful in subsequent claims or whether that evidence will be helpful or prejudicial to their interests.  These considerations should not enter the settlement negotiations.  For example, in this case, Defendant Guenther has introduced evidence from McDevitt's settlement offer to his wife in which his attorney asserted that the prenuptial agreement was drafted by Guenther acting as Yoakam's attorney.[10]  It would be inequitable and asymmetrical to allow Plaintiff to block this evidence under Rule 408 because it favors Defendant (since the evidence would appear to go toward the issue of Guenther's possible liability regarding who she represented), but allow Plaintiff to introduce evidence from the same settlement if it favors him.  Moreover, the Court is reluctant to admit settlement evidence simply because it is the settlement offeror who seeks to admit the evidence.  Furthermore,

---

[10] The Court reiterates that Plaintiff has not objected to the letter from his divorce counsel.

many considerations which had nothing to do with Guenther's involvement may have entered into the determination of the settlement amount paid by McDevitt; such as Yoakam's claims she was coerced by him and that he failed to disclose all of his assets.  As the Second Circuit has observed, "widespread admissibility of the substance of settlement offers could bring with it a rash of motions for disqualification of a party's chosen counsel who would likely become a witness at trial." Pierce v. F.R. Tripler & Co., 955 F.2d 820, 828 (2d Cir. 1992). While the attorneys who handled the settlement in the divorce may be different than the attorneys who are arguing the instant case, it is generally undesirable to invite situations where attorneys will be called as witnesses in actions involving their clients. The Court is conscious of the larger policy concerns underlying Rule 408 and the consequences of cutting back its scope.  The Ninth Circuit has established that it will apply Rule 408's prohibition on evidence from a prior settlement with a third party and a different underlying claim.  The Court is not convinced that the Ninth Circuit would depart from the rule set forth in Hudspeth simply because the party seeking to introduce the evidence was a party to the settlement.[11]

---

[11]  The Court recognizes that this ruling appears to require a party to make difficult decisions where he seeks to settle his divorce case but contemplates bringing a cause of action against the attorney who drafted the prenuptial agreement for malpractice.  In this scenario, the ruling does not seem to

27

The Court concludes that Rule 408 bars the admission of and reliance upon Plaintiff's settlement with his wife to calculate his damages claim against Defendant.  Defendant's Motion for Summary Judgment on and Motion in Limine on the issue of the applicability of Rule 408 are GRANTED.

## III. Whether Plaintiff's Damages Are Speculative

Defendant's Motion asserts that Plaintiff's claim for damages of $235,000 must fail because it is impermissibly speculative and premised upon an inadmissible settlement agreement.  Defendant attempts to defeat Plaintiff's tort claims for negligence and legal malpractice because actual damages is a necessary element of these causes of action. The Ninth Circuit has held that "negligence is the essence of a malpractice action." Breda v. Scott, 1 F.3d 908, 909 (9th Cir. 1993); Peterson v. Kennedy, 771 F.2d 1244, 1259 (9th Cir. 1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642 (1986).  Thus, any claim for negligence alleged in Plaintiff's complaint is necessarily incorporated into the ensuing discussion on legal malpractice. See Boskoff, 57 F. Supp. 2d at 998.  Like negligence, a claim for legal malpractice requires a plaintiff to prove the element of actual damages. Id.

encourage settlement of the divorce case by the Plaintiff, which does not appear in accord with one of the pronounced purposes of Rule 408.  Yet, on the other hand, as stated supra there are sound reasons for precluding introduction of the settlement agreement.

In addition, a finding that Plaintiff's damages were speculative would also defeat Plaintiff's claim for fraud.  To assert a claim for fraud under Hawai'i law,

> [T]he evidence must show that (1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them. Further, plaintiff must show that he suffered substantial pecuniary damage for the aim of compensation in deceit cases is to put the plaintiff in the position he would have been had he not been defrauded.

Shanghai Investment Co. v. Alteka Co., 92 Haw. 482, 497, 993 P.2d 516, 531 (Haw. 2000)(overruled on other grounds by Blair v. Ing, 31 P.3d 184, 186, 96 Haw. 327, 329 (Haw. 2001))(internal citations and quotations omitted).

The Hawai`i Supreme Court has noted that speculative damages are not recoverable in actions arising under contract or in tort.  See Roxas v. Marcos, 89 Haw. 91, 140-141 n.33, 969 P.2d 1209, 1258 - 1259 n.33 (Haw. 1998). Under Hawai'i law, the elements of a negligence claim include, inter alia, "[a]ctual loss or damage resulting to the interest of another." McLellan v. Atchison Ins. Agency, Inc., 81 Haw. 62, 65, 912 P.2d 559, 563 (Haw. Ct. App. 1996)(citations omitted). "Actual [losses or] damages are those that are real and substantial as opposed to speculative." Id. (citation omitted). The McLellan court relied upon the reasoning of Professors Prosser and Keeton on the Law of Torts:

29

Since the action for negligence developed chiefly out of the old form of action on the case, it retained the rule of that action, that proof of damage was an essential part of the plaintiff's case. Nominal damages, to vindicate a technical right, cannot be recovered in a negligence action, where no actual loss has occurred. The threat of future harm, not yet realized, is not enough. Negligent conduct in itself is not such an interference with the interests of the world at large that there is any right to complain of it, or to be free from it, except in the case of some individual whose interests have suffered.

W.P. Keeton, Prosser and Keeton on the Law of Torts § 30, at 164-65 (5th ed. 1984).

As discussed in depth above, Federal Rule of Evidence 408 bars Plaintiff from utilizing evidence of the amount he paid in settlement with Yoakam to calculate his damages.  Because McDevitt has not alleged any other admissible evidence demonstrating his injury (e.g., that he incurred other financial costs due to Guenther's actions), he has failed to set forth his damages with sufficient certainty. In Banker, the court reversed a damages award that impermissibly relied upon a settlement agreement with a third party under Rule 408 as lacking a reasonable assurance of certainty when no other explanation of the amount of the award was provided in the record.  37 F.3d at 872.  Likewise, Plaintiff impermissibly relies upon his settlement amount of $485,000 to calculate his damages against Guenther.  His two alternative calculations of damages are either the difference between the amount he paid Yoakam in settlement and the amount he would have paid under his desired premarital

agreement (with a cap at $250,000) or the difference between the settlement amount and the written premarital agreement (with the sliding scale provision).  Because he is barred by Rule 408 from relying on his settlement amount to prove his amount of damages, Plaintiff has failed to assert damages with sufficient certainty.

Even if Rule 408 did not bar Plaintiff's allegation of damages, Guenther argues that McDevitt's $235,000 claimed damages are speculative because they are calculated based upon a never-formed premarital contract.  Guenther asserts, and McDevitt does not object, that Yoakam in fact never signed any agreement capping McDevitt's settlement liability at $250,000.  McDevitt's only evidence that a premarital agreement capping his settlement liability at $250,000 existed is his own testimony that Yoakam was "prepared to sign a premarriage agreement reflecting a lump sum payment of $250,000 and that this agreement was reflected in the facsimile sent to Ms. Guenther on August 20, 2000." See Pl. Opp. at 18. McDevitt's testimony that Yoakam agreed to the $250,000 capped payment conflicts with Yoakam's own testimony that she objected to the cap because she thought it was unfair. See McDevitt depo. at 80-81; McDevitt Aff. at ¶ 7; Yoakam depo. at 58. Section 572D-2 of the Hawai`i Revised Statutes provides, "A premarital agreement must be in writing and signed by both parties."  Furthermore, "[a]n antenuptial agreement is unenforceable under the statute of frauds unless it is in writing

and signed by the party to be charged." Rossiter v. Rossiter, 4 Haw. App. 333, 338, 666 P.2d 617, 620 (Haw. Ct. App. 1983)(citing Hawaii's Statute of Frauds, codified at Haw. Rev. Stat. § 656-1). Any oral agreement that may have been reached by McDevitt and Yoakam is unenforceable and cannot provide the basis for calculating McDevitt's damages.

McDevitt counters Guenther's Motion by arguing that speculative damages do not exonerate an attorney in a legal malpractice case.  Among the cases he cites is McClung v. Smith, 870 F. Supp. 1384, 1391 (E.D. Va. 1994), which states the principle that "the actual damage requirement does not permit a negligent lawyer to evade responsibility for malpractice by claiming that the damages are too 'speculative' in nature to be determined." 870 F. Supp. at 1391.  This statement, however, followed the McClung court's conclusion that "[d]amages will be calculated on the basis of the value of what was lost or the consequences of the adverse judgment suffered by the client; and, although the client is not required to prove the exact amount of incurred damages, she is required to show facts and circumstances from which the trier of fact can make a reasonably certain estimate of those damages." Id.

The case at bar presents a different issue than addressed by McClung. McDevitt asserts his claimed amount of damages with certainty and specificity down to the dollar

32

($235,000), so the problem is not that the exact amount of
claimed damages is uncertain.  The fatal problem is that McDevitt
has not produced any evidence to demonstrate that he would have
been entitled to a $250,000 cap but for Defendant's actions.
Plaintiff himself cites two cases that articulate the notion that
"damages are speculative only if the uncertainty concerns the
fact of whether there are any damages rather than the amount."
See London v. Weitzman, 884 S.W.2d 674, 677 (Mo. Ct. App. 1994);
Viehweg v. Mello  5 F. Supp. 2d 752, 761 (E.D. Mo. 1998)(quoting
London).  Here, it is impossible to know what the outcome of a
negotiated prenuptial agreement would have been if both sides had
their own counsel.  Nor is it certain that Yoakam would have
agreed to such a prenuptial or any prenuptial agreement on her
own free will if advised by separate counsel and made aware of
her rights.  In Vestar Development, II, LLC v. General Dynamics
Corp., a case interpreting California law, the court held that
damages are impermissibly speculative when based upon a non-
binding agreement that did not set terms because "[t]here is no
way to know what the terms of the eventual sale would have been-
or even if a deal would have been reached."  249 F.3d 958, 962
(9th Cir. 2001). Like the non-binding agreement in Vestar, there
is no way to know whether an enforceable premarital agreement
with a $250,00 cap would have been reached.  Accordingly, it is
uncertain whether McDevitt suffered any injury by agreeing to the

33

$485,000 settlement. Plaintiff's claim for $235,000 damages is impermissibly speculative because it is based upon an unenforceable oral agreement and because it is impossible to know what the outcome of a negotiated agreement would have been.

In any event, the Court concludes that Rule 408 prevents Plaintiff from relying on his settlement amount with Yoakam to prove his amount of damages, and thus Plaintiff has failed to assert damages which are not speculative. Defendant Guenther's Motion for Summary Judgment on the issue of whether Plaintiff's claim for damages is speculative is GRANTED. Plaintiff may not recover speculative damages for any of his claims, and Plaintiff's claims requiring the element of actual damages are hereby dismissed.

## IV. Whether Plaintiff's Unlawful Business Practice Claim is Barred by Statute of Limitations

Plaintiff may not recover speculative damages for claims for unlawful business practices under Haw. Rev. Stat. § 480-2. Moreover, the vast majority of Defendant's alleged unlawful business practice violations are barred by the statute of limitations. Interpreting Haw. Rev. Stat. § 480-2, the U.S. District Court in Roberts Waikiki U-Drive Inc. v. Budget Rent-A-Car Systems adopted the reasoning of the United States Supreme Court in Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 339 (1971): "even if injury and a cause of action have accrued as of a certain date, future damages that might arise

34

from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." Roberts Waikiki U-Drive, 491 F. Supp. 1199, 1228 (D. Haw. 1980)(quoting Zenith Radio, 401 U.S. at 339).  As discussed at length in the discussion above, McDevitt's claimed damages from Guenther's actions are impermissibly speculative.  Accordingly, Plaintiff's claim for damages due to unlawful business practices are unrecoverable.

Defendant further argues that Plaintiff's claim under Haw. Rev. Stat. § 480-2 alleging unfair business practices is barred by the applicable statute of limitations.  Haw. Rev. Stat. § 480-24 provides:

> Any action to enforce a cause of action arising under this chapter shall be barred unless commenced within four years after the cause of action accrues . . . For the purpose of this section, a cause of action for a continuing violation is deemed to accrue at any time during the period of the violation.

Defendant Guenther argues that a cause of action under section 480-2 accrues upon the occurrence of the alleged violation (the "accrual rule"), which in this case was in August of 2000 when the prenuptial agreement was drafted.  Plaintiff argues that the cause of action accrues upon his discovery of the alleged violation (the "discovery rule").  Plaintiff also argues that Guenther engaged in a continuing violation in 2004 when she told Yoakam's divorce counsel that she did not believe the agreement was enforceable.

35

The Court holds that the applicable rule governing the statute of limitations for claims arising under Haw. Rev. Stat. § 480-2 is the occurrence rule.  The U.S. District Court in <u>Roberts Waikiki U-Drive</u>, concluded that § 480-24 applied the occurrence rule:

> Regardless of whether plaintiffs knew of their cause of action as to some fly-drives before this date, each new fly-drive was an alleged new act of unfair competition or a new unfair trade practice, and hence as each fly-drive occurred, a new cause of action accrued.

491 F. Supp. at 1227.[12]  Furthermore, in Haw. Rev. Stat. § 480-3, the legislature states: "This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes, except that lawsuits by indirect purchasers may be brought as provided in this chapter." Federal unfair trade laws also contain a four-year limitations period and follow the occurrence rule.  "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." <u>Zenith</u>, 401 U.S. at 338.  The <u>Zenith</u> court went on to state that for allegations of continuing violations, "this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that

---

[12]  There do not appear to be any cases decided by the Hawai`i Supreme Court or the Intermediate Court of Appeals that addresses whether § 480-24 follows the occurrence or discovery rule.

act and that, as to those damages, the statute of limitations runs from the commission of the act." Id.

The Court is not persuaded by Plaintiff's argument that the discovery rule applicable to legal malpractice claims under Haw. Rev. Stat. § 657-1 should be extended to Plaintiff's unfair business practices claim. See Blair v. Ing, 95 Haw. 247, 265-67, 21 P.3d 452, 469-71 (Haw. 2001). Adopting the discovery rule would contradict the court's conclusion in Roberts Waikiki U-Drive, and Plaintiff has provided no reason for the Court to doubt the validity of that holding. Moreover, applying the discovery rule to an unlawful business practices claim would be contrary to the legislature's intent that the state unfair trade laws should be construed consistent with judicial interpretations of their federal counterparts. Thus, the Court concludes that the statute of limitations period started running when Defendant's alleged violation occurred. The statute of limitations bars any claim that occurred prior to the four-year limitations period. To the extent that McDevitt asserts a claim based on Guenther's review and drafting of the prenuptial agreement in August of 2000, his unfair business practices claim filed on April 20, 2006 is barred by the four-year statute of limitations.

According to Roberts Waikiki U-Drive, each additional occurrence of an unlawful business practice gives rise to an

37

additional claim.  Id. McDevitt alleges that Guenther engaged in unlawful business practices in 2003 and 2004 when she attended a meeting with Yoakam and her divorce attorney and where she told Yoakam's divorce attorneys she did not believe the prenuptial agreement was enforceable.  Although these additional occurrences would not be time-barred, McDevitt's asserted damages flowing from the violation are unrecoverable because they are speculative.  For all these reasons, McDevitt's claim under Haw. Rev. Stat. § 480-2 must fail.  Defendant's Motion for Summary Judgment on Plaintiff's claim for unfair business practices is GRANTED.

## V.   Motion to Strike Plaintiff's Expert's Report

Defendant seeks to strike the expert report of Charles Kleintop set forth in two letters dated January 9, 2006 and March 27, 2007 and attached to Plaintiff's Reply and Opposition to Defendant's Counter-Motion for Summary Judgment.  Defendant seeks to strike Kleintop's report because: (1) Kleintop has not been qualified as an expert witness under Federal Rule of Evidence 702 and Dabuert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); (2) Kleintop's report is not authenticated or presented in competent form; (3) Kleintop cannot testify to the law or the application of the law to the facts; (4) Kleintop's testimony about facts in the case is inadmissible hearsay; (5) Kleintop failed to disclose the data on which he relied to produce the

expert report as required by Fed. R. Civ. P. 26(a)(2)(B); and (6) Kleintop is biased because he is and was McDevitt's attorney.

Defendant's first argument that Kleintop has not been qualified as an expert witness under Fed. R. Evid. 702 is unavailing.  "Determining whether a witness is an expert is ordinarily within the discretion of the trial court." McClaran v. Plastic Industries, Inc., 97 F.3d 347, 357 n.8 (9th Cir. 1996). Under Rule 702, an expert may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702. "A witness is qualified as an expert by knowledge, skill, experience, training, or education." Id. Moreover, "[d]istrict courts are not required to hold a Daubert hearing before ruling on the admissibility of scientific evidence." In re Hanford Nuclear Reservation Litigation, 292 F.3d 1124, 1138 (9th Cir. 2002).  Here, it is evident from the resume attached to his expert report that Kleintop is qualified as an expert in the area of family law by his education, training, and experience.  Kleintop has been a managing partner of a family law practice for twenty-five years; he has served as chairperson, vice-chairperson, secretary, and chairperson of the Rules Committee of the Disciplinary Board of the Hawaii Supreme Court; and he has served as the vice chair and chairperson of the family law section of the Hawaii State Bar Association.  No

<u>Daubert</u> hearing is necessary to qualify Kleintop as an expert in the subject of the practice of family law in Hawaii.

The Supreme Court has held that "[expert] testimony is admissible only if it is both relevant and reliable." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 141, 119 S. Ct. 1167, 1171 (1999)(citing <u>Daubert</u>, 509 U.S. at 597, 113 S. Ct. 2786). <u>Daubert</u> proposed certain factors for evaluating the reliability of scientific expert testimony: methodology, testing, peer review and publication, error rates, and "acceptability" in the relevant scientific community. <u>Id.</u> at 593-95, 113 S. Ct. 2786. In <u>Kumho</u>, the Court held that the court's gate-keeping function applies not only to scientific expert testimony but also to testimony based on technical or other specialized knowledge. 526 U.S. at 141, 119 S. Ct. 1167. In addition, the court concluded that the <u>Daubert</u> factors are flexible and that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." <u>Id.</u> In some cases, the court noted, "the relevant reliability concerns may focus upon personal knowledge or experience." <u>Id.</u> at 150, 119 S. Ct. 1167.

In the instant case, Kleintop was engaged by Plaintiff to "measure the actions and omissions on the part of Ms. Guenther against the standards of ethical practice recognized and observed by members of the practicing Bar here in Hawai`i during the

relevant time period." See Kleintop Depo. Exh. "A" at 1.  One

relevant inquiry for the reliability of an opinion about the

local standards and customary practice of members of the Hawai`i

bar is Kleintop's personal experience and knowledge of the

standards recognized by the Hawai`i bar.  Although the Court has

not been able to find any cases that articulate a complete set of

factors specific to the testimony of attorney experts, courts

have relied on a variety of measures to assess reliability of

attorney expert testimony: (1) whether the expert identified the

materials relied upon and personally examined the file underlying

the case; see Pierce v. Gilchrist, 2007 WL 128993, *2 (W.D. Okla.

2007); Cadle Company v. Sweet & Brousseau, P.C., 2006 WL 435229,

*5 (N.D. Tex. 2006); (2) whether the expert sufficiently

explained why he or she reached an opinion; see Victory Lane

Productions, LLC v. Paul, Hastings, Janofsky & Walker, LLP, 2006

WL 83501, *3 (S.D. Miss. 2006); Pierce, 2007 WL 128993 at *2; (3)

whether the expert cited other sources relied upon by attorneys

such as applicable statutes, treatises, or publications by

professional organizations; see Glazer v. Brookhouse 2007 WL

543454, *3-4 (E.D. Wis. 2007); or (4) whether the expert

demonstrated that his opinion is accepted by his peers; see

Lifemark Hospitals, Inc. v. Jones, Walker, Waechter, Poitevent,

Carrere & Denegre, 1999 WL 33579253, *3 (E.D. La. 1999).  This is

a non-exhaustive annotation of various tests relied upon in

different courts, and thus the expert testimony need not satisfy all of these criteria to be deemed reliable.

The Court finds that Kleintop's experience as a member of the Disciplinary Board of the Hawai`i Supreme Court and his lengthy experience as a practitioner of family law constitutes a sufficient basis for Kleintop to reliably form an opinion about the customary practices and standard of care among family law attorneys in Hawai`i. Kleintop stated in the report that he reviewed the case file in the McDevitt and Yoakam divorce proceeding, transcripts of depositions of Yoakam, McDevitt, and Guenther, and the exhibits to those transcripts.  Kleintop relied on acceptable methodology of looking to statutes, the Hawai`i Rules of Professional Conduct, and legal decisions to form his opinion. Finally, in many places in the report, Kleintop explained why he reached the opinions and conclusions he did. The Court finds that Kleintop's expert report meets the reliability requirement set forth in <u>Daubert</u> and <u>Kumho Tire</u>.

The Court also disposes of Defendant's second argument that Kleintop's expert report must be excluded because it is not in proper form.  Plaintiff produced Kleintop's sworn deposition in which he authenticated the expert opinion letters dated January 9, 2006 and March 27, 2007. <u>See</u> Pl. Opp. Exh. "K", Kleintop Depo. at 13.  "In a summary judgment motion, documents authenticated through personal knowledge must be 'attached to an

42

affidavit that meets the requirements of Fed. R. Civ. P. 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.'" Orr v. Bank of America, NT & SA, 285 F.3d 764, 773-74 (9th Cir. 2002). Plaintiff's attorney submitted affidavits for both Plaintiff's Reply and Opposition in which he swore that the attached exhibits contained true and accurate copies of the deposition of Kleintop and deposition exhibits taken on April 16, 2007. This is sufficient to meet the requirements of Fed. R. Civ. P. 56(e). Kleintop's expert report, attached as an exhibit to Mr. Kleintop's deposition, is thus competent in form for the purposes of the instant Motions.

Defendant next argues that Kleintop's expert report is inadmissible because it violates the general rule that "a witness cannot be allowed to give an opinion on a question of law." Specht v. Jensen, 853 F.2d 805, 807 (10th Cir. 1988). The Ninth Circuit has recognized this rule barring experts from opining about legal conclusions. See, e.g., U.S. v. Scholl, 166 F.3d 964, 973 (9th Cir. 1999)(finding that testimony concerning the reasonableness of defendant's belief that he could net out wins and losses was legal conclusion inappropriate for expert testimony); Aguilar v. International Longshoremen's Union, Local # 10, 966 F.2d 443, 447 (9th Cir.1992) (finding expert testimony that workers reasonably and foreseeably relied on defendants' promises addressed "matters of law for the court's determination"

that were "inappropriate subjects for expert testimony"). The rationale is that it is the province of the court to articulate the applicable law for the jury, and allowing expert legal opinion on questions of law interferes with the judge's role as the "sole arbiter of the law." Pinal Creek Group v. Newmont Mining Corp., 352 F. Supp. 2d 1037, 1043 (D. Ariz. 2005)(quoting Wollan v. U.S. Department of the Interior, Bureau of Land Management, 997 F. Supp. 1397, 1403 (D. Colo. 1998)). In addition, courts have prohibited expert opinion that applies the law to the facts, as this usurps the role of the jury. See Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 508-11 (2d Cir. 1977).

In Marx, the expert construed the contract at issue in the case and repeatedly gave his conclusions as to the legal significance of various facts adduced at trial. He testified as to what the defendant "should have" done to fulfill its contractual obligation and that there were no legal excuses for nonperformance. See Marx, 550 F.2d at 510. The court concluded that this expert testimony was improper and superfluous, stating, "[t]he admission of such testimony would give the appearance that the court was shifting to the witnesses the responsibility to decide the case. It is for the jury to evaluate the facts in the light of the applicable rules of law, and it is therefore erroneous for a witness to state his opinion on the law of the forum." Id.

44

In <u>Pinal Creek</u>, the court excluded the expert reports of law professors where such reports "offer[ed] nothing other than a discussion of the law and an application of the law. The report reads more like a legal brief than an expert report." <u>Pinal Creek</u>, 352 F. Supp. 2d at 1044.   The <u>Pinal Creek</u> court noted that while the law professors were prohibited from stating the law, interpreting case law, or applying the law to the facts of the case, they were permitted to opine on corporate norms and whether the acts of the parties fit within the norms.   <u>Id.</u> at 1045-46.

Kleintop is qualified as an expert in family law and is competent to opine about the norms and practices of family law attorneys in Hawai`i.   Kleintop's report goes much further than discussing the standard of care among Hawai`i lawyers.   In its opening paragraph the report states, "This report also constitutes my opinion of the consequences of the actions and omissions on the part of attorney Lianne Guenther during the course of her association with Dr. Timothy McDevitt . . . ." <u>See</u> Kleintop Depo. Exh. "A" at 1.   Kleintop's report reads like a legal brief and includes numerous legal conclusions.   For example, Kleintop opines:

"Did this 'advice by Ms. Guenther to Dr. McDevitt constitute the formation of an attorney-client relationship? Yes, it did." <u>Id.</u> at 3.

45

"Should Ms. Guenther have provided the foregoing advice to Dr. McDevitt, thereby forming an attorney-client relationship with him?  No, she should not have." <u>Id.</u>

"Ms. Guenther had a duty to clarify, for both parties, that she was representing only Dr. McDevitt and not Ms. Yoakam. <u>See</u> <u>Kotsur v. Kelly</u>, 791 S.W.2d 254 (Tex. App. 1990); <u>Burnap v. Linnartz</u>, 914 S.W.2d (1995); and Rule 4.3(a), HRPC." <u>Id.</u> at 7.

"Did Ms. Guenther breach the standard of care here in Hawai`i in her drafting of the premarital agreement between Dr. McDevitt and Ms. Yoakam? Yes, she did." <u>Id.</u> at 8.

"Did Ms. Guenther engage in the unauthorized practice of law here in Hawai`i by providing legal advice to Dr. McDevitt and by preparing a premarital agreement between Dr. McDevitt and Ms. Yoakam? Yes, she did." <u>Id.</u> at 9.

"Ms. Guenther violated Dr. McDevitt's attorney-client privilege and the rule of confidentiality when she met with and provided information to Ms. Kong relating to her (Ms. Guenther's) representation of Dr. McDevitt in preparing the premarital agreement at his request in August of 2000." <u>See</u> Kleintop Depo. Exh. "B" at 3.

"Since the case settled for far more than what the premarital agreement provided, Ms. Guenther successfully influenced the outcome of the case by violating her professional obligations to Dr. McDevitt . . . . had Ms. Guenther not

undermined the premarital agreement and improperly influenced Mr. Yim, the case would likely have settled early in accordance with the terms of the premarital agreement . . . ." Id. at 5-6.

These are but a few examples of the legal conclusions and application of the law to the facts of the case contained in Kleintop's report.  Indeed, Kleintop cites case law to support his conclusions and interprets the meaning and applicability of Hawai`i statutes.  Like the experts' reports in Marx and Pinal Creek, the Court finds that large portions of Mr. Kleintop's report are inadmissible because he makes legal conclusions, comments on the applicable law, and applies the law to the facts, thus invading the province of the court and the jury.  The Court precludes Kleintop from offering his legal conclusions, but he is permitted to testify about the standard of care amongst family law practitioners here in Hawai`i.

Defendant next argues that Kleintop's testimony about the facts in the case is inadmissible hearsay.  Fed. R. Evid. 703 provides, in relevant part,

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing . . . Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Applying Rule 703 to Kleintop's expert report, it is permissible for Kleintop to base his opinion on facts that are otherwise

inadmissible, such as information about conversations that would be barred as inadmissible hearsay. Under Rule 703, it is not necessary for an expert to have personal knowledge of the facts upon which he bases his opinion.  However, to the extent that Kleintop's report simply recites facts that constitute inadmissible hearsay, those sections of the report are barred. For example, Kleintop states, "When this case came to Mr. Yim, Ms. Guenther and Ms. Yoakam had already laid the groundwork for discrediting the premarital agreement . . . . There were clearly discussions between Ms. Guenther and Ms. Yoakam regarding Yoakam's 'state of mind' at the time she signed the premarital agreement, regarding Dr. McDevitt's disclosure of assets at the time the premarital agreement was prepared, and regarding Ms. Yoakam's 'lack of understanding' at the time she signed the premarital agreement."  See Kleintop Depo. Exh. "B" at 5. Defendant objects that many of Kleintop's statements of fact are inadmissible hearsay. Generally, the facts on which Kleintop bases his opinion are also the facts in dispute before the factfinder in this case.  For this reason, the probative value of any inadmissible facts would be outweighed by confusion to the jury and the prejudicial effect of having an expert recite inadmissible facts as though they are established.  The Court concludes that the recitation of otherwise inadmissible facts contained in Kleintop's report are not admissible under Rule 703.

48

Defendant also argues that Kleintop should not be allowed to testify on this motion for summary judgment because he has not disclosed all documents from the file that he allegedly used to prepare his expert report.  Kleintop has disclosed the documents he relied upon, and to the extent that there is a controversy over whether he relied upon email correspondence between the divorce mediator and McDevitt's attorney, an internal memorandum by McDevitt's counesl, and the notes of an associate of Kleintop from an interview with McDevitt in 2003, which he has not disclosed, Defendant Guenther has not identified for the Court what portions of Kleintop's opinion appear to rely on such undisclosed documents.  If Defendant wishes to pursue the issue, Defendant should file a Motion to Compel or seek a discovery order with the Magistrate Judge.  In any event, based on the Court's ruling on the instant Motions, the Court need not address this issue at this time for the purposes of deciding the subject Motions.

Defendant's final argument regarding the bias and credibility of Plaintiff's expert is not appropriate for the Court's consideration at summary judgment.  Defendant acknowledges as much.  An expert's bias or credibility is an issue for jury and not an appropriate factor on which the Court may decide whether to admit an expert's testimony. See Slaughter v. Southern Talc Co., 919 F.2d 304, 306 n.2 (5th Cir. 1990).

49

In sum, the Court GRANTS in part and DENIES in part Defendant's Motion to Strike Plaintiff's Expert's report.  The portions of Kleintop's report that opine about the applicable law, make legal conclusions, apply the law to the facts of the case, or recite facts that are inadmissible are barred.  The portions of Kleintop's report that express his opinion on the applicable customary (but not legal) standard of care for family law attorneys in Hawai`i are admissible.  The portions of Kleintop's report that recites facts that are otherwise inadmissible are barred.

## CONCLUSION

For the foregoing reasons, the Court: (1)DENIES Plaintiff's Motion for Partial Summary Judgment on the issue of the existence of an attorney-client relationship; (2) DENIES Defendant's Counter Motion for Summary Judgment on the issue of the non-existence of an attorney-client relationship; and (3) GRANTS Defendant's Motion for Summary Judgment on the issue of speculative damages; (4) GRANTS Defendant's Motion for Summary Judgment and Motion in Limine on the inadmissibility of evidence from Plaintiff's settlement with his wife under Federal Rule of Evidence 408; (5) GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's claim under Haw. Rev. Stat. § 480-2; and (6) GRANTS in part and DENIES in part Defendant's Motion to Strike Plaintiff's Expert Kleintop's testimony.

IT IS SO ORDERED.

DATED: Honolulu, Hawai`i, July 20, 2007.



_____
Alan C. Kay
Sr. United States District Judge

McDevitt v. Guenther, Civ. No. 06-00216 ACK-BMK, Order Denying Plaintiff's Motion for Partial Summary Judgment, Denying Defendant's Counter-Motion for Summary Judgment, Granting Defendant's Motion for Summary Judgment and Motion in Limine, and Granting in Part and Denying in Part Defendant's Motion to Strike Plaintiff's Expert's Testimony.